# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LINDA S. SNYDER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06cv00020 |
| | ) | **<u>MEMORANDUM OPINION</u>** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| **Commissioner of Social Security,** | ) | By:    PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## *I. Background and Standard of Review*

Plaintiff, Linda S. Snyder, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

Case 2:06-cv-00020-PMS   Document 14   Filed 01/23/07   Page 1 of 19   Pageid#: 75

(4th Cir. 1987.)  Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966.)  "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642.)

The record shows that Snyder protectively filed her application for DIB on or about November 21, 2003, alleging disability as of March 28, 2000, based on ruptured discs, surgical procedures, chronic numbness of the right leg, chondromalacia of the knees, anxiety and depression.  (Record, ("R."), at 70-73, 83, 101.)  Snyder's claim was denied both initially and on reconsideration.  (R. at 48-50, 53-56.) Snyder then requested a hearing before an administrative law judge, ("ALJ"). (R. at 57.)  The ALJ held a hearing on September 19, 2005, at which Snyder was represented by counsel. (R. at 230-47.)

By decision dated October 28, 2005, the ALJ denied Snyder's claim. (R. at 12-17.) The ALJ found that Snyder met the disability insured requirements of the Act for DIB purposes through June 30, 2001, but not thereafter.[1] (R. at 16.) He further found that Snyder had not engaged in substantial gainful activity since her alleged onset of disability. (R. at 16.) The ALJ found that Snyder had a severe musculoskeletal impairment, but he found that she did not have an impairment or combination of

---

[1]Because Snyder's date last insured is June 30, 2001, she must show that she was disabled on or prior to that date in order to be eligible for benefits.

impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16.) The ALJ further found that Snyder's allegations regarding her disabling pain and other symptoms were not credible and were not supported by the documentary evidence. (R. at 16.) The ALJ found that Snyder had the residual functional capacity to perform light work, diminished by an inability to stand more than a total of three hours in an eight-hour workday or more than 30 minutes without interruption and by an ability to only occasionally bend, stoop and squat.[2] (R. at 16.) Therefore, the ALJ found that the Snyder was unable to perform her past relevant work as a deli worker and a floral designer. (R. at 16.) Based on Snyder's age, education, past work experience and the testimony of a vocational expert, the ALJ found that Snyder could perform jobs existing in significant numbers in the national economy, including those of an assembler, a grader, a sorter, an inspector, an interviewer, a production coordinator, a messenger and an office clerk. (R. at 17.) Thus, the ALJ found that Snyder was not under a disability as defined by the Act and was not eligible for benefits at any time through June 30, 2001, the date she was last insured. (R. at 17.) *See* 20 C.F.R. § 404.1520(g) (2006).

After the ALJ issued his opinion, Snyder pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 5-11.) Snyder then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2006.) The case is before this court on Snyder's motion for summary judgment filed July 17, 2006, and the Commissioner's motion for summary judgment filed August 21, 2006.

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* C.F.R.§ 404.1567(b) (2006).

-3-

## II. Facts[3]

Snyder was born in 1958, (R. at 71,) which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c) (2006). She has a tenth-grade education.[4] (R. at 233.) Snyder has past relevant work experience as a florist and a bakery/deli clerk. (R. at 115.)

Dr. Edward Griffin, M.D., a medical expert, testified at Snyder's hearing. (R. at 239-42.) Dr. Griffin testified that Snyder had a history of lumbar disc disease that persisted to the time of the hearing. (R. at 240.) However, after reviewing the medical evidence, Dr. Griffin found that Snyder's impairments did not meet or equal a listed impairment. (R. at 240.) Dr. Griffin opined that Snyder could perform light work diminished by an inability to stand and walk for more than a total of three hours in an eight hour workday and an inability to stand and walk for more than 30 minutes without interruption. (R. at 240.) Dr. Griffin further found that Snyder could occasionally bend, stoop and squat. (R. at 240.)

Thomas Schacht, Ph.D., a psychological expert, also was present and testified at Snyder's hearing. (R. at 242-43.) Schacht testified that the medical evidence showed

---

[3]As noted previously, the medical evidence relevant to the claim currently before the court is that relating to the time period on or prior to June 30, 2001. To the extent that any medical evidence relevant to the period subsequent to June 30, 2001, is included in this Memorandum Opinion, it is so included for clarity of the record only.

[4]Although Snyder testified at her hearing that she went to the eleventh grade, she stated in her Disability Report that she completed the tenth grade. (R. at 89, 233.)

-4-

that Snyder suffered from low average intelligence. (R. at 242.) Schacht noted that while seeing Dr. Kotay, Snyder complained of depression, prompting him to refer her to Dr. McKnight. (R. at 242.) Schacht further noted that there was a limited mental health record, all of which related to the time period prior to the alleged onset date of disability. (R. at 242.) Schacht testified that Snyder was placed on medication to treat her depression, which responded favorably. (R. at 243.) Dr. McKnight performed a residual functional capacity assessment, finding that Snyder was seriously limited in nine areas and had no useful ability to handle stress. (R. at 243.) Snyder last saw Dr. McKnight on November 8, 1999, and she ceased taking her medications shortly after her discontinuation of treatment. (R. at 243.) Schacht opined that Snyder's mental impairments did not meet or equal a medical listing. (R. at 243.)

Robert Spangler, a vocational expert, also was present and testified at Snyder's hearing. (R. at 243-46.) Spangler classified Snyder's work as a bakery worker as light and unskilled and her job as a floral designer as light to medium and semi-skilled.[5] (R. at 244.) He testified that she had no transferrable work ability.(R. at 244.) Spangler was asked to consider a hypothetical individual of Snyder's age, education and work experience, who could perform light work diminished by an inability to stand for more than three hours in an eight-hour workday and an inability to stand for more than 30 minutes at a time, as well as an occasional ability to bend, to stoop and to squat. (R. at 244.) Spangler testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of an interviewer, a production coordinator, a factory messenger, a general office clerk, an assembler, a

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567 (c) (2006).

-5-

grader, a sorter, a production inspector, a nonconstruction laborer and a hand packer. (R. at 245.) Spangler was then asked to assume the same hypothetical individual, but who also had the mental restrictions assessed by Dr. McKnight on September 21, 1999. (R. at 184-86, 245.) Spangler testified that there would be no jobs available that such an individual could perform. (R. at 245.) Finally, Spangler testified that an individual with the restrictions as testified to by Snyder would not be able to perform any jobs. (R. at 245.)

In rendering his decision, the ALJ reviewed records from Dr. L. D'Amato, M.D.; St. Mary's Hospital; Park Avenue Wellness; Norton Community Hospital; Dr. Sreenivasan C. Kotay, M.D.; Dr. Leopoldo Bendigo, M.D., an orthopedist; Dr. Russell McKnight, M.D., a psychiatrist; Dr. Kevin Blackwell, D.O., an orthopedist; Dr. Richard Surrusco, M.D., a state agency physician; and Dr. Gary Parrish, M.D., a state agency physician.

The record shows that Snyder first complained of back pain to Dr. L. D'Amato, M.D., in January 1992 after lifting a large mixing bowl. (R. at 118.) At that time, an x-ray showed mild scoliosis of the lower lumbar spine. (R. at 119.)

Snyder saw Dr. Sreenivasan C. Kotay, M.D., from May 19, 1995, through September 7, 2005. (R. at 122-64, 216-21.) On May 19, 1995, Snyder complained of back pain that radiated into her right leg and foot with some numbness, which began after lifting a bucket the previous month. (R. at 155.) Dr. Kotay noted that an MRI showed a large disc rupture at the L4-L5 level of the spine and degenerative disc disease at the L3-L4 level of the spine. (R. at 154.) Dr. Kotay opined that Snyder most

-6-

likely would need to undergo a disckectomy at the L4-L5 level of the spine, but he noted that he would administer an epidural block first in an effort to alleviate her pain. (R. at 154.) On June 9, 1995, Dr. Kotay noted that Snyder had undergone the epidural block, which "helped her a lot." (R. at 153.) Snyder reported some continued pain, not as bad as before, and no numbness. (R. at 153.) Dr. Kotay advised Snyder to perform home exercises. (R. at 153.) A repeat epidural block was performed on July 7, 1995. (R. at 153.) Dr. Kotay again noted that if pain and numbness persisted, a lumbar disckectomy might be necessary. (R. at 153.) On August 9, 1995, Snyder continued to complain of a lot of pain with increased leg pain. (R. at 152.) Dr. Kotay recommended a lumbar disckectomy, which was performed later that month. (R. at 152.) On August 25, 1995, Dr. Kotay noted that Snyder did excellent following surgery, but that she had experienced some recurrence of pain. (R. at 152.) He stated that this could be due to nerve swelling which would improve. (R. at 152.) He again advised Snyder to exercise. (R. at 152.) By September 15, 1995, Snyder reported a marked decrease in pain. (R. at 151.) On October 16, 1995, Dr. Kotay noted that Snyder's back was doing very well and she had no leg pain. (R. at 151.) He noted some "crunching" of Snyder's left knee, but opined that no treatment was necessary. (R. at 151.)

On May 23, 1996, Dr. Kotay reported that Snyder had complete relief of leg symptoms following her disckectomy. (R. at 151.) However, he noted that some numbness had returned. (R. at 151.) Dr. Kotay opined that there could be a recurrent disc rupture. (R. at 150.) However, an MRI showed no such recurrent rupture. (R. at 150.) Dr. Kotay opined that Snyder might have some scar tissue binding down on the nerve root. (R. at 150.) He further opined that no treatment was necessary. (R. at

-7-

150.) On July 22, 1996, Snyder complained of continued back and leg pain. (R. at 150.) Dr. Kotay planned to perform more epidural blocks. (R. at 150.) On January 28, 1997, Dr. Kotay noted some continued intermittent numbness of the leg and some occasional leg pain. (R. at 149.) Dr. Kotay opined that Snyder had a five percent to 10 percent disability of the spine and a five percent disability as to sciatic nerve root involvement. (R. at 149.) He opined that Snyder would not improve further. (R. at 149.) He found that she could perform sedentary activities and could lift items weighing up to 20 pounds. (R. at 149.) Dr. Kotay further found that Snyder could not repeatedly bend or twist. (R. at 149.) He determined that Snyder had reached maximum medical improvement and needed no further treatment. (R. at 149.)

On February 17, 1997, Snyder saw Dr. Leopoldo Bendigo, M.D., for a consultative orthopedic examination. (R. at 165-68.) A physical examination revealed minimal tenderness of the cervical region with no evidence of any spasm. (R. at 166.) A neurological examination showed no evidence of any weakness. (R. at 166.) Although Dr. Bendigo noted decreased sensation, Snyder's reflexes were normal. (R. at 166.) Dr. Bendigo diagnosed Snyder with chronic lumbar radicular syndrome, and he recommended conservative treatment with nonsteroidal anti-inflammatory medications. (R. at 166.)

On January 15, 1998, Snyder continued to complain of right leg pain. (R. at 149.) A physical examination revealed that Snyder had good motion of the lumbar spine. (R. at 148.) Sitting root tests and leg raising tests were negative. (R. at 148.) Dr. Kotay reported no change in Snyder's condition, and he advised her to take anti-inflammatories as needed. (R. at 148.) On June 8, 1998, Snyder continued to

complain of the same back and leg pain. (R. at 148.) She reported that Relafen helped her "a lot." (R. at 148.) On January 8, 1999, Snyder reported some back pain, controlled with Relafen. (R. at 147.) Snyder also complained of depression. (R. at 147.) Dr. Kotay referred her to see Dr. McKnight. (R. at 146-47.)

Snyder saw Dr. Russell McKnight, M.D., on February 1, 1999, for a psychiatric evaluation. (R. at 184-86.) Snyder reported feeling stressed and depressed due to her inability to work. (R. at 184.) She further reported that she was very limited in her activities, stating that she did not have money to socialize or buy necessities. (R. at 184.) Snyder reported that she had never sought psychiatric treatment. (R. at 185.) She complained of fatigue, and Dr. McKnight noted that her affect was flat. (R. at 185.) She stated that she was depressed all of the time. (R. at 185.) Dr. McKnight noted that Snyder was alert and oriented and appeared to be functioning in the normal range of intelligence. (R. at 185.) He noted no psychotic features. (R. at 185.) Dr. McKnight stated that Snyder was mildly slow cognitively, and she reported some forgetfulness and poor concentration. (R. at 185.) Dr. McKnight diagnosed Snyder with anxiety depression with insomnia secondary to pain and depression, not otherwise specified. (R. at 185.) He further diagnosed chronic pain syndrome and a then-current Global Assessment of Functioning, ("GAF"), score of 50.[6] (R. at 186.) Dr. McKnight prescribed a trial of Celexa and referred her to a licensed clinical social worker for counseling and psychotherapy. (R. at 186.)

---

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41 to 50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning. ..." DSM-IV at 32.

-9-

On May 18, 1999, Snyder reported increased right leg pain and numbness. (R. at 145.) A physical examination revealed normal motor strength and straight leg testing with gluteal pain at 60 degrees. (R. at 145.) Dr. Kotay noted that Snyder's reflexes were intact. (R. at 145.) Another MRI was performed on June 16, 1999, revealing mild L4-L5 spondylosis. (R. at 161-62.) It showed no recurrent disc rupture and only minimal scar tissue. (R. at 144.) On October 11, 1999, Dr. Kotay prescribed Relafen, and on February 10, 2000, he prescribed anti-inflammatories. (R. at 144.) On August 23, 2000, Snyder reported that Relafen was no longer helping her pain. (R. at 143.) She was prescribed Vioxx. (R. at 143.) On May 3, 2001, Snyder reported having tripped and fallen over a water hose two weeks previously. (R. at 142.) She noted increased back pain. (R. at 142.) Straight leg raise testing was negative bilaterally. (R. at 142.)

Dr. McKnight completed a mental assessment of Snyder on September 21, 1999, finding that Snyder had a good ability to follow work rules, to use judgment, to maintain personal appearance and to demonstrate reliability. (R. at 173-75.) He found that she had a fair ability to relate to co-workers, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out simple, detailed and complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 173-74.) Finally, Dr. McKnight found that Snyder had a poor or no ability to deal with the public and to deal with work stresses. (R. at 173.)

On September 7, 2005, Dr. Kotay opined that Snyder's impairments met or equaled the requirements of § 1.04(A) prior to June 30, 2001, Snyder's date last

-10-

insured, and that she had been disabled since January 17, 1995.  (R. at 216.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims.  *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work.  *See* 20 C.F.R. § 404.1520 (2006).  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated October 28, 2005, the ALJ denied Snyder's claim. (R. at 12-

17.) The ALJ found that Snyder met the disability insured requirements of the Act for DIB purposes through June 30, 2001, but not thereafter. (R. at 16.) He further found that Snyder had not engaged in substantial gainful activity since her alleged onset of disability. (R. at 16.) The ALJ found that Snyder had a severe musculoskeletal impairment, but he found that she did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16.) The ALJ further found that Snyder's allegations regarding her disabling pain and other symptoms were not credible and were not supported by the documentary evidence. (R. at 16.) The ALJ found that Snyder had the residual functional capacity to perform light work, diminished by an inability to stand more than a total of three hours in an eight-hour workday or more than 30 minutes without interruption and by an ability to only occasionally bend, stoop, and squat. (R. at 16.) Therefore, the ALJ found that the Snyder was unable to perform her past relevant work as a deli worker and a floral designer. (R. at 16.) Based on Snyder's age, education, past work experience and the testimony of a vocational expert, the ALJ found that Snyder could perform jobs existing in significant numbers in the national economy, including those of an assembler, a grader, a sorter, an inspector, an interviewer, a production coordinator, a messenger and an office clerk. (R. at 17.) Thus, the ALJ found that Snyder was not under a disability as defined by the Act and was not eligible for benefits at any time through June 30, 2001, the date she was last insured. (R. at 17.) *See* 20 C.F.R. § 404.1520(g) (2006).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its

judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Snyder argues that the ALJ erred by failing to give controlling weight to the opinions of Dr. Kotay, her treating physician. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 7-10.) Snyder also argues that the ALJ erred by failing to find that her impairments met or equaled § 1.04(A), the medical listing for disorders of the spine, on and prior to June 30, 2001. (Plaintiff's Brief at 10-13.) Finally, Snyder argues that the ALJ erred by failing to find that she suffered from a severe mental impairment on and prior to June 30, 2001. (Plaintiff's Brief at 13-15.)

-13-

Snyder argues that the ALJ erred by failing to give controlling weight to the opinion of Dr. Kotay, her treating physician. (Plaintiff's Brief at 7-10.) For the following reasons, I disagree.

The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d)(2) (2006). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Dr. Kotay's opinion that Snyder has been disabled since January 1995 is inconsistent with his own treatment notes and is contradicted by other substantial evidence of record. For instance, Dr. Kotay's treatment notes from the time period relevant to the court's disability determination show that Snyder did well following back surgery in 1995. Although she experienced some recurrent pain and numbness, physical examinations by Dr. Kotay revealed a good range of motion of the lumbar spine, negative sitting root testing and straight leg raise testing, normal motor strength and intact reflexes. (R. at 137, 142, 145, 148.) An MRI in May 1996 revealed no recurrent disc rupture. (R. at 150.) While Snyder exhibited positive straight leg raise testing in May 1999, an MRI performed the following month showed no recurrent disc rupture. (R. at 145, 161-62.) Moreover, Dr. Kotay's treatment notes indicate that Snyder's symptoms were controlled with medication. (R. at 140, 147-48.) It is well-

-14-

settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Also, in January 1997, Dr. Kotay stated that Snyder could perform sedentary activity, could lift items weighing up to 20 pounds with no repeated bending or twisting. (R. at 149.) As recently as February 2002, nearly eight months after Snyder's date last insured, Dr. Kotay noted that Snyder was "doing good." (R. at 142.) Thus, for these reasons, I find that Dr. Kotay's opinion that Snyder was disabled since January 1995 is inconsistent with his own treatment notes. For the following reasons, I further find that it is contradicted by other substantial evidence of record from the relevant time period.

In February 1997, Dr. Bendigo noted that Snyder exhibited some decreased sensation, but had normal reflexes and exhibited no weakness. (R. at 166.) He diagnosed chronic lumbar radicular syndrome and recommended conservative treatment. (R. at 166.) Although the remainder of the notes contained in the record are dated subsequent to Snyder's date last insured, it is important to note that none of these sources support Dr. Kotay's disability finding. For instance, in May 2004, Dr. Kevin Blackwell, D.O., noted negative straight leg raise testing bilaterally, normal size, shape, symmetry and strength of the upper and lower extremities and good and equal upper and lower reflexes. (R. at 200.) Dr. Blackwell opined that Snyder could lift items weighing up to 45 pounds at a time, but up to only 20 pounds frequently. (R. at 201.) He further found that she could sit for a total of eight hours in an eight-hour workday and stand for six hours in an eight-hour workday. (R. at 201.) Dr. Blackwell opined that she should avoid squatting, kneeling or crawling. (R. at 201.) The following month, state agency physician Dr. Parrish concluded that Snyder could perform light work, and he specifically stated that Dr. Kotay's opinion that Snyder was disabled from

-15-

any gainful employment was not supported by Snyder's limitations. (R. at 212.) For all of these reasons, I find that substantial evidence supports the ALJ's decision to reject the opinion of Dr. Kotay.

Snyder next argues that the ALJ erred by failing to find that her impairments met or equaled § 1.04(A), the medical listing for disorders of the spine, on and prior to June 30, 2001. (Plaintiff's Brief at 10-13.) Again, I disagree.

To meet § 1.04(A), a claimant must suffer from either a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture, resulting in compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A) (2006). Also, the regulations specifically state that the responsibility for determining whether a claimant's condition meets or equals a listed impairment rests with the Commissioner. *See* 20 C.F.R. § 416.927(e)(2) (2006).

As demonstrated by the above-stated facts, there is no evidence contained in the record showing that Snyder's impairments met or equaled the requirements of § 1.04(A) on or prior to June 30, 2001. Specifically, in May 1996, following Snyder's back surgery, Dr. Kotay ordered an MRI, which ruled out recurrent disc rupture. (R. at 150.) In February 1997, Snyder exhibited no weakness and her reflexes were normal. (R. at 166.) In January 1998, sitting root tests and straight leg raising tests

-16-

were negative. (R. at 148.) In May 1999, Snyder exhibited normal motor strength and intact reflexes. (R. at 145.) Straight leg raise testing was positive at 60 degrees. (R. at 145.) Another MRI, performed in June 1999, showed no recurrent disc rupture and only minimal scar tissue. (R. at 144.) In May 2001, straight leg raise testing was negative. (R. at 142.) Finally, I note that Dr. Griffin, the medical expert, testified that Snyder's impairment did not meet or equal a listed impairment. (R. at 240.) For all of these reasons, I find that substantial evidence supports the ALJ's failure to find that Snyder's impairments met or equaled § 1.04(A), the listed impairment for disorders of the spine, on or before June 30, 2001.

Based on my review of the record, I also reject Snyder's argument that the ALJ erred by failing to find that she suffered from a severe mental impairment on and prior to June 30, 2001. (Plaintiff's Brief at 13-15.) The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2006). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1521(b) (2006). The Fourth Circuit held in *Evans v. Heckler*, that, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations

-17-

omitted).

While Dr. McKnight found that Snyder had fair abilities to relate to co-workers, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out simple, detailed and complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations and a poor or no ability to deal with the public and to deal with work stresses, the ALJ correctly rejected Dr. McKnight's assessment as inconsistent with his treatment notes. (R. at 16, 173-74.) I further note that Snyder was prescribed medication which appears to have helped to control her symptoms. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross*, 785 F.2d at 1166. I further note that the medical evidence contained in the record relating to Snyder's mental complaints is related to the time period prior to Snyder's alleged onset date. Finally, I note that the psychological expert, Schacht, testified that Snyder did not suffer from a mental impairment that met or equaled a listed impairment. (R. at 243.) For all of these reasons, I find that substantial evidence supports the ALJ's failure to find that Snyder suffered from a severe mental impairment on or prior to June 30, 2001.

### IV. Conclusion

For the foregoing reasons, Snyder's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed.

-18-

An appropriate order will be entered.

DATED:     This 23rd day of January 2007.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE